May it please the court. I'm August Flingy with the Justice Department and I'm here on behalf of the Secretary of HHS, Tommy Thompson. This case concerns the technical and complicated Medicare disproportionate share hospital adjustment. We'll call it the DISH adjustment. But it raises enormous practical consequences on the Secretary's ability to prospectively fill gaps left by Congress in a federal program it administers in a manner that is actually more beneficial to Medicare providers like the plaintiffs in this case, the hospitals here in Oregon. The Secretary was faced with the situation that Congress clearly had not envisioned. The demonstration projects which create expansion populations who are not eligible for Medicaid but which are receiving benefits under a demonstration program that is paid for with federal matching payments from the Medicaid program. The Secretary, as these demonstration projects, programs became more prevalent, initially had a policy of since they weren't eligible, the most natural reading of the statute which is keyed on eligibility did not include those in the Medicare DISH calculation. But in 2000, and at a cost of nearly $2 billion over five years, the Secretary issued a new rule that was going to include those individuals. Now this new rule is benefiting the plaintiffs here, these hospitals in Oregon, which has an expansion waiver demonstration program. But the hospitals that are plaintiffs here would like to benefit from this rule for past years, years prior to 2000, before the Secretary issued the new rule. They're trying to benefit from what they think their statutory rights are, not from the rule. Well, sure. This is all on the assumption that the statute is not clear. If the statute is clear, which I will explain why it isn't, the case is closed. As Chevron says, if Congress has directly spoken to the issue, then that interpretation must prevail. But here, the statute is not clear, and there are four very strong reasons why it's not clear. First, the language of the statute, it reads, it counts people who are, quote, eligible for medical assistance under a state plan approved under subchapter 19. Now the first reason is that they did not talk there about expansion populations or demonstration projects at all. Why aren't the people that participate in expansion populations receiving benefits under a state plan? They are receiving benefits under a demonstration project. I didn't say benefits. I mean medical assistance under a state plan. They are, what they are receiving is medical, they're receiving medical care, but it's authorized by the demonstration project statute. Part of the state plan, is it not? Doesn't the statute say that the funds that are appropriated for a demonstration project have to be treated as part of a state plan? So the benefits are paid for out of the state plan funds? It's true that the Medicaid, I mean the whole point of the demonstration project is allow Medicaid matching funds to be used to pay for these benefits. But in focusing on the term medical assistance, which the district court and the plaintiffs do, they're not looking at the words before that, which is, are these people eligible for medical assistance under a state plan? Isn't that the whole point of the waiver process that section 1115 makes them eligible for medical assistance? Even though otherwise they might not be? No, that's actually not the way it works. The waiver process allows the costs of the care to be deemed, to be put into the Medicaid program, but it does not make those people eligible for Medicaid. In fact, they're not eligible. They don't qualify under the Oregon state Medicaid plan. They don't qualify under the Congress's limitations on income, resources, or status. Well, wait a minute. You say they don't qualify under the state plan. They would qualify, would they not, if you put the waiver, take the waiver into account? Doesn't that result in their qualifying the fact that there's a waiver? Without this demonstration project provision, which is in subsection 11 of the Social Security Act, they are not eligible for Medicaid. That's true. So we have a separate source of authority that allows these people to receive medical care. Well, that doesn't follow, does it? Title 19 makes them eligible because of the waiver provision. Otherwise, they wouldn't be eligible. It's the demonstration project provision that allows them to receive care, and that care is then, the federal government can then match the cost of that care. But it doesn't make them eligible for Medicaid. It allows their care to be covered by the federal Medicaid program. So they're not Medicaid patients? If they operate as part of the expansion population, they're not Medicaid patients? They're not eligible for Medicaid. Well, what does that mean, they're not eligible? Well, when Congress enacted this DISH provision in 1985, there had never been an expansion, there had never been a demonstration project that created an expansion population. One had never existed before. And so that goes a long way to answering the question of whether Congress directly spoke to the issue. It simply did not face up to the issue of how this demonstration project provision would interact with the DISH and with the Medicaid statute, and it didn't answer that question. In statutes enacted in the 90s, Congress did answer the question. The other side cites several of them, and in those statutes, Congress says, well, people who are eligible for medical assistance, and it adds a parenthetical, and we're including expansion populations here. In this statute in 1986, it didn't do that, and the conclusion that one must get from that is that Congress just did not face up to this issue. Don't we have to look at the entire provision? It says patients who, for such days, were eligible for medical assistance under a state plan approved under subchapter 19 of this chapter. So these people were approved because the demonstration plan had to be approved under Title 19. That's not true. The demonstration plan is approved and authorized by Title 11, also called subchapter 11. But the state plan that incorporates the demonstration project has to be approved under Title 19. Isn't that correct? The state Medicaid plan, of course, is approved under Title 19. That's the Medicaid Act. And the demonstration project is part of the state Medicaid plan. Is that correct? I don't think you can simply say that. The demonstration project is authorized by a different part of the Social Security Act. Is it part of the state Medicaid plan? If it's not, what is it encompassed under? It is not part of the state Medicaid plan. It's a stand-alone demonstration project? Is that your position? Well, it's separately authorized. It's authorized by a provision of the statute. I'm not asking how it's authorized. I'm asking you under what rubric does it function? Does it function as part of the state Medicaid plan? I mean, I think demonstration projects can function in different ways. Under the record in this case, how is it administered? It's my understanding that the method of reimbursement to the states, the matching payments that go from the federal government to the states, are managed pursuant to the Medicaid Act. That's what the demonstration project statute allows. But at the same time, the terms used in the DISH statute say eligible for medical assistance under a state plan approved under subchapter 19. And it's like putting a round peg into a square hole to say that that specifically refers to people who get benefits under a demonstration project. They're not eligible. This court in Legacy Emanuel said we have to – eligibility is the key here. And other courts said we look at Congress's resource, income, and status limitations, because that's what Congress was looking at when they created the DISH adjustment. And here, if you look at those, these people do not satisfy those eligibility requirements. What do you say is the point of Section 1115, then, the waiver provision? What's the point? What purpose does it serve? Well, the purpose is to allow states to try innovative methods to provide care to more people, to provide different types of care, more comprehensive care. And one problem with the other side's interpretation is it's going to make that provision – it's going to squelch innovation in demonstration projects. What does it waive, then? What is the point of the waiver? What's the effect of the waiver under 1115? Well, as I said, it allows people who do not – who are not eligible for Medicaid to receive benefits. To become eligible. The federal government will pay matching payments for them. Doesn't it allow people who are not otherwise eligible to become eligible? I don't think that's a proper way to portray it, or at least it's not so clear that it's not ambiguous. Congress was faced with the situation. They did not – they didn't – these projects did not exist at the time, so it's hard to say they directly answered the question. They really left a gap to fill. And if we're talking about policy, the policy concerns really lean in favor of allowing secretary deference here. The secretary approves innovative Medicaid projects for a variety of reasons. These are the best ways to try and provide care to low-income people. But if these carry along with it this unexpected expense that is not uniform from state to state, it will discourage the approval of these projects. It will – Oregon is a good example. Their program is great. They increased the people who got benefits with federal cost sharing by 66% in 1995. Now, that increase of 66% is mostly single people who are below the poverty line. Those people are not covered by Medicaid. But in doing so, that 66% increase in what they would like their dish payment to represent is not uniform with any other state because other states have to provide care to those people with their own dollars, and there's no increase in dish payments based on that. So you have a state like California, they don't have a – they might not have a demonstration project that covers single people below the poverty line, but the states will find their own ways to pay for that care, and then you won't get a uniformity. Isn't the purpose of the dish formula to fairly reimburse hospitals that provide Medicare services for the increased cost resulting from having to serve basically poor people? This eligibility for Medicaid is a proxy for poverty. Absolutely. All right, now these people that are included in the expansion population are poor people. Not necessarily as poor as – Not as poor as some, but they wouldn't even be in the game unless they were in the poverty range. So these people are among the people that impose an additional burden on the Medicare hospitals, and therefore the logic of this whole formula is to include them in the calculations of DSH. I don't think that's quite correct because this is the Medicare DSH, and it's designed to help reimburse hospitals for greater cost of care in the Medicare program. Here we're talking about Medicaid people, and the Medicaid fraction is simply used to kind of come up with a rough estimate of a hospital's ratio of poor patients that it treats. Now, the estimate is rough. Hospitals treat all kinds of low-income people outside of the Medicaid program. Many states have their own state programs. That doesn't go into this calculation. Many hospitals treat people on their own dollar. Many poor people manage to pay for care themselves because they're not covered by Medicaid. None of these people are included, but that doesn't mean, since we have a demonstration project here in Oregon that covers some of these people, now the Medicare DSH payment is off-kilter with the payment in other states, and the secretary has to have the discretion to weigh these competing considerations. Is there a finite pot of money that's used for DSH payments? Are there unlimited funds, or isn't there a certain amount of money that's allocated for these payments? I don't know the answer to that, Your Honor. I'm sorry. I can tell you that these are very costly, and ultimately there's obviously a finite pot of money. This money is coming out of somewhere else, and that's yet another reason that the secretary should have discretion to determine to weigh these factors. You have the factors that you have suggested. Well, look, these hospitals in Oregon are now, they might be treating more single people below the poverty line. They might actually not. They might have treated them before under a state program. We don't know. But they might be treating more. Does it matter, really, whether the poor people are in California or in Oregon or in North Carolina? Does it really matter to the federal government where the poor people live who are being served? I don't think it matters, but what I'm expressing is that it matters under their interpretation of this provision. It matters greatly. If a state like Oregon happens to have an expansion population, it changes what they get compared to what other states will get. What difference does it make? That's my question. What difference does it make if Oregon gets proportionally more money for serving poor people if the goal is to include more poor people throughout the country in terms of coverage for medical care? What difference does it make what state gets more money? I don't understand that policy. That money has to come from somewhere, Your Honor. There's not an endless supply of money. When the money comes for these hospitals, it's coming away from somewhere. That's my point. When it's gone, it's gone, whether it goes to California, Oregon, Vermont, Michigan, Maine. When it's gone, it's gone. So what difference does it make, the proportion? I don't get your argument. Congress certainly didn't say anything about equity across states or taking into account the different size of populations of poor people in one state or the other. We're just looking at the face of the statute, what it requires to be done in a particular case. Congress spoke in terms of eligibility, and this Court in Legacy Emanuel said that's the key term. And when Congress enacted the statute, there was an obvious place to look for that. It was Congress's own eligibility limitations, which the demonstration project statute allows to be waived, allows to be disregarded. So in these cases, it's true that many of the people served in this plan are poor, but there are now new, more innovative demonstration projects out there coming down the pipeline. They try and provide a limited benefit, a prescription drug benefit or a family planning benefit to a group of people who's much higher than the poverty line, a very broad group of people. Counsel, your limited benefit waiver argument, was that made in the district court? Limited benefit waiver? You were alluding to the more innovative programs that have limited benefit waivers that go beyond traditional Medicaid populations. Did you make that argument in district court? I'm not sure that the regulations had been promulgated at that time, but we do feel it's our obligation to raise ñ I mean, this is another change to the same regulation, and a decision in this case could impact that, and we encourage the court to leave that question open for another day. Well, but if you didn't raise it in district court, it's not really fairly raised here, is it? Well, I don't think ñ it's not a distinct argument. We're simply raising the point ñ the argument is the statute's not clear, and in further support of that we're saying, well, look, these demonstration projects can change, can distort the adjustment in many ways, many unexpected ways, and it's just another reason why it's clear that Congress did not face up to this issue and it's left it to the agency to address. The court has said in legacy, which you like to quote, that Congress intended the Medicare and Medicaid fractions to serve as a proxy for all low-income patients. What do you say about that? That's the holding of this court. Doesn't that knock your argument out? If we look at, say, the Sixth Circuit case, they said to do it by ñ they did that by focusing on the eligibility criteria. Well, I'm just asking you to comment on what this court has held. I understand. All low-income patients. I'm just saying that when Congress enacted it, they were looking at their ñ they look at their eligibility criteria. They know that there are gaps, but they might have increased the amount of payment to cover those gaps they could not predict. Now, if we throw those gaps in, as the plaintiffs would like here, now we're increasing that ratio even more. Counsel, some hospitals interpreted the statute originally to include the expansion group, and they were paid for that. Isn't that correct? Absolutely. There were definitely some states that were doing this incorrectly. And not just in this respect. They were throwing all care that was state-covered, because Medicare is essentially a state program, into this calculation. Medicaid is a state program. Medicaid, yeah. Not Medicare. Yeah, no, I understand. They were ñ the data they were providing for this calculation included all of the state programs, Medicaid, demonstration projects, and state-only programs. And HHS honored those interpretations. It did, based on their reliance interest. But it's important to understand the plaintiffs in this case, they say in their affidavit, they understood that the policy in Oregon was different. The Eighth Circuit in a decision I sent in yesterday that was decided in September upheld the policy, essentially a hold harmless policy. It understood that there are important interests that these hospitals in budgeting and in other matters relied on the erroneous interpretation. And that sort of reliance interest, preserving a reliance interest, is a very legitimate and certainly not arbitrary and capricious reason for allowing that hold harmless policy in certain states. I see that my time is up. By the way, is there any authority that supports your position on the decided cases, on the proposition that the programs under the ñ that it must be treated separately for purposes of the Medicaid fraction? This is an issue of first impression in the appellate courts. So I think if we look at the Legacy Emanuel case, they said we're keying it to eligibility, and it's certainly not clear what Congress was thinking of at the time. Were they thinking of their own eligibility factors, which makes perfect sense, or were they envisioning that other groups could be brought in? I stress that the statute is ambiguous. However the court holds on the prior policy, I encourage the district court was clearly wrong in holding the statute to be clear to directly address this issue. Thank you. Thank you, counsel. My name is Sanford Pittler of the law firm Benedict Lohenrieder. We represent the hospitals in this case. With me at the counsel table is Mr. Charles Gallagher, who is local counsel on the case. And if I ñ I'd like to mention that Ms. Francine Harmon from Oregon South Sciences University Medical Center and Mr. Dan Borders from Portland Adventist Medical Center are here observing as well. Your Honors, just before I start, I had prepared some boards with excerpts from the record, but the print is too small. I've also prepared copies of the boards with the record sites, et cetera, quotes from various documents that are in the record, et cetera. May I distribute same to the court and to opposing counsel so that we can refer to them in our discussion? It's not anything new. It's just kind of a compilation from the records. The only thing that is new was a supplemental authority, which was provided to the court in San Francisco and copies here to your court.  Thank you, Your Honor. While local counsel is doing that, Your Honor, I actually anticipated something that I was going to ask, which was we renew our request, which is in our briefs, that arguments, facts, that the secretary is trying to bring to the court's attention on appeal for the first time should not be allowed. In fact, I think it's Judge Schwarzer's decision in universal hospital, is it? No, in health services. In a recent case, the plaintiffs there tried to raise additional arguments on appeal, and the opinion issued by Your Honor said that those are waived if they weren't raised in the trial court. We have the same situation here. This whole limited waiver, reliance, all these sorts of arguments that have been concocted in the appellate briefs weren't raised to the court below and really should be considered waived. To be quite honest, I believe all of them are not germane and don't really speak to the issue here anyway, but we believe that the court should not consider them. The second opening comment I'd like to make is I find it kind of ironic that Judge Nelson and I are back here in a case. Judge Nelson was on the panel, the unanimous panel on Legacy Emanuel, and in that case the secretary was arguing that the only days you could put into the dish calculation were those that were paid for by the state Medicaid program. It's ironic that here we are today and the secretary is arguing that days paid for by the state Medicaid program aren't to be included in the calculation. I just find that we've come sort of full circle here. Every one of these days that we're talking about is paid for by Oregon Medicaid. Every one of these days is paid for in part with Title 19 medical assistance dollars. And the arguments that are being advanced here by the secretary really are, for the most part, manufactured for the purposes of trying to support an interpretation that had one aim and one aim only, which was to separate the demonstration projects from the state plan so the secretary could say, we don't have to include the days in the dish calculation. And, in fact, you can't separate those things. They are part and parcel of each other. What's your response to opposing counsel's argument that the hospitals you represent did not seek reimbursement for demonstration projects until the new regulation came out? Well, Your Honor, the hospitals are seeking to exercise their statutory rights. I understand that, but what's your response to his position that you kind of slept on your rights? Well, this is the Medicare system, Your Honor. In the Medicare system, you can't bring a claim on a cost report until the intermediary has audited the cost report, issued a revised notice of program reimbursement. That takes years. For the most part, many of these years, almost all of these years, the notice of program reimbursement wasn't issued until after the secretary's new regulation, and so they couldn't be challenged in those contexts. We could only challenge them pursuant to the regulations that set forth how these things are to be done in Medicare. It takes years to wait for the program reimbursement notice to be issued. It takes years to get before the PRRB. It takes years to get to court. And so the fact is, Your Honor, there are other reasons for that which we have not placed in the record because we don't want to cause any problems for the people in the state government. But, in fact, if that was an important issue, we could provide information to Your Honors that would show why it is the hospitals didn't appeal at the beginning. There was no regulation. There wasn't a single published statement anywhere by the secretary any time that expansion demonstration populations were not to be included. The only way we knew of it is our fiscal intermediary said you couldn't include them, right? The first time that the secretary issued a stated opinion about this was when he abandoned it in January 20, 2000. That's when he articulated this notion of the fact that, well, there are hypothetical eligibles under a waiver demonstration project and expansion eligibles, and even though the hypothetical eligibles aren't eligible in his view for medical assistance under a state plan because they're under the demonstration project, they could have been eligible, right, under the old state plan, so we're going to count them in the past. We wouldn't count the expansions, but now we're going to count them in the future. Nothing changed, Your Honor, between January 19 and January 20. The statute didn't change. The regulations didn't change. Nothing changed. These people are eligible for medical assistance under a state plan, and let me show you why. If you look, the first page in this set of handouts deals with the meeting of the Medicaid DISH statute, and you all have already discussed the fact of the language, et cetera, but I want to point out that the Fourth Circuit, who's listed on the bottom here, in Cabell Huntington, right, very carefully analyzed this and said, medical assistance is defined in a Medicaid statute as payment of part or all the cost of 25 listed types of medical care. The phrase under a state plan does no more than reference the particular Medicaid plan covering the patient in question. Such Medicaid plans are formulated by each state but must comply with federal Medicaid statute in order to receive federal funds. The opposing counsel hangs his argument on the word eligible for medical assistance. Yes, Your Honor. And that's where his disagreement is with you. Yes, Your Honor. May I ask the Court to look at page 3, which is the Section 1115 waiver? Your Honor, Judge Joe Kirks and Judge Jones below very clearly understood that the demonstration project is not separate from the state plan. It doesn't allow the secretary to waive parts of the state plan. It allows the secretary only to waive federal requirements in Section 1902 and substitute them with new requirements. And that's exactly what has happened here. You cannot waive the requirement of a state plan in Section 1901. You cannot waive the requirement in Section 1903 that Title 19 medical assistance can only be provided for people who are eligible under a state plan. Expenditures for medical assistance from Title 19 can only be expenditures for people who are eligible under a state plan. The only thing the secretary can waive are the 94, I repeat that, the 94 requirements for a state plan in Section 1902. If you look on the next page, you'll see that the secretary for the Oregon health plan waived 11 of 94. Of the 11, the only things that were waived that had to do with eligibility are right here, Section 1902A10C, right, the medically needy eligibility, which allowed them to raise the income eligibility level to 100% of federal poverty, the federal poverty level, right, for the demonstration eligibles. And to waive the requirements that a medically needy program be available to pregnant women and children. That means that's less of a benefit. Eligibility standards, to enable the state to waive the income disregards and resource limits to base financial eligibility solely on gross income, rather than on income net of statutory disregards, and to waive income deeming rules to base eligibility on household family units, rather than individual income. That is the sum total of the waiver of the state plan requirements in 1902 that have to do with eligibility. There are 80 other, 83 other requirements for a state plan that weren't waived that the secretary says in his letters to Oregon must be continued to be adhered to. So all the demonstration project does is it says, okay, we're going to let you try to do something a little different here. We're going to let you waive these requirements, substitute new eligibility requirements, right, and still require you to meet all the other state plan requirements. The demonstration project is not separate from the state plan. It can't be. You can't provide Title 19 money unless it's under the state plan. That's why the statute, remember, the waiver statute applies to numerous programs under the Social Security Act. The waiver statute applies to AFDC and other programs. Each of those programs has a state plan requirement statute and a payment statute, and Congress refused to waive the payment statute in any of those programs. The reason is, is the payment statute, Congress didn't want Secretary tinkering with that, and the payment statute says we will pay medical assistance for items expended under the state plan under 1902. Right? Since you couldn't waive 1903, that's why the regarding language is in Section 1115, right? It says you can waive these requirements, substitute new requirements, and you can consider the expenditures to the extent and period of time that you decide as under the state plan. So these people are meeting new state plan eligibility requirements. That's the essential point in this case. The only way the Secretary can succeed in this case is the Secretary convinces you, which he could not convince either of the judges below, that there's two different kinds of Title 19. There's Title 19 under the state plan, and then there's medical assistance under Title 11. That is not the case, Your Honor. The state plan is very clearly the governing body of the entire Medicaid program in Oregon. Another point, counsel says it's not fair. You can't allow Oregon to have all these days included. The fact is, Your Honor, is that counsel has not cited to a single statute in his statutory provision in his brief that shows that Congress set the low-income limits under Title 19. In fact, for the most part, Congress does not. The category eligibility under 1902 is set with reference to state decisions. For example, anyone who was eligible for AFDC, Aid to Families with Dependent Children, or its succeeding program, TANF, right, they become automatically eligible for Medicaid. But who sets the poverty level people have to meet in order to be eligible? The states. The richer states set it higher. The poorer states set it lower. Consequently, and Congress knew all this. If you look at the legislative history, there was testimony, there was information to Congress about this whole proxy, that they knew it would vary from state to state, because the richer states could allow people with higher poverty incomes to be eligible, and the poorer states couldn't. Not only that, in the statute, there are optional people, optional eligibles under 1902, certain pregnant women and children. If a state opts to include those under 1902, then there will be many more days in the Medicaid proxy. Some states can afford to do that. Some states can't. The whole notion that it's unfair because Oregon would do this, you should see the amount of days that are counted in California, a richer state. The whole point of the Legacy Emanuel case, for example, was the secretary was limiting the Medicaid proxy by reference to paid days, and Oregon only allowed a certain number of paid days, while richer states allowed as many days as you were in the hospital. That's the whole point of the situation we have here. There is no difference with respect to the demonstration project eligibility and the state plan eligibility. People under the demonstration project are eligible because the secretary has waived the old eligibility requirements and substituted new ones. In addition, Congress has repeatedly over the years, if you go to page six, we offer this to show that Congress understands the relationship between a state plan and a demonstration project, and that relationship is not totally divorced one from the other. If you take a look in the Medicaid Coverage Data Bank, which was passed in 1993, right, they defined a Medicaid beneficiary as an individual entitled to benefits under state plan for medical assistance under Title 19, including a state plan operating under a statewide waiver. That is exactly what Oregon is. It's a statewide waiver. There is no Medicaid eligibility in Oregon other than under OHP. Opposing counsel's argument was that this provision shows that if Congress wanted to define this population as eligible, a similar parenthetical would have been included in the definition of eligible patient under the statute. Excuse me, Your Honor. Sorry for talking over you. That would be treated only if Congress thought that the waiver statute somehow created a different kind of eligibility. It doesn't. It's part of the state plan. It is by its terms part of the state plan. And all this is saying is the relationship between a state plan and a demonstration project is that a statewide demonstration project, like Oregon, is the entire state plan is operating under the statewide demonstration. That means the waived requirements of 1902 and the new ones adopted by the Secretary, right, govern the entire state plan along with all the other unwaived requirements. There isn't anything separate between the two. You can take a look at every single one of these references. Every one of these references show that Congress understands that there is no separation from between a demonstration project and the state plan. The demonstration project must, right, be under the state plan. Otherwise, why would Congress in the waiver statute say, and, Secretary, you can decide that these meet the objectives of Medicaid, and you can regard these expenditures as under the state plan. If Title 11 was creating a whole new medical assistance, they would have to put it under the state plan. The fact is that that's because the statute, Title 19, says you cannot pay medical assistance to anyone unless they're eligible under the state plan. So the demonstration project, a demonstration project doesn't even have to touch eligibility. It could be waiving, for example, as you all probably know or you may be familiar with, the real demonstration part of OHP wasn't the eligibility. It was ranking services and putting them in a priority and deciding how to spend Medicaid money based on a priority, a prioritization of services, right? So you'd still have the same language because they would be waiving a requirement in 1902, substituting a new requirement, and the statute, Title 11, 1115, has to say you can include those expenditures as expenditures under the state plan. Otherwise, you couldn't use Title 19-1. That's the way the statutes have worked, 1901, 1902, 1903. The fact is that these sites on page 6 show you that Congress understands the relationship between a state plan and a demonstration project. Am I? I could tell the way you were moving.  One other thing I want to be able to say, and, in fact, you will find it on page 7. The Secretary's argument here is that the language allowing the Secretary to the extent and for the period prescribed to be regarded as expenditures under the state plan. The Secretary is saying, oh, that grants me all this deference, right? I can say, well, they're getting medical assistance under a state plan for this purpose, but not for the purpose in the DISH statute. I.e., the Secretary is arguing that a statute, 1115, passed in 1962, amended in 1965 for Medicaid, authorizes the Secretary to abrogate a Medicare statute passed in 1986. All I would point you, Your Honor, to is the position the Secretary took about the exact same language before the Ninth Circuit in the Bino case. It's at the bottom. And the only thing I would say is, in her view, the extent and period inquiry is simply a nondiscretionary rote review. That's what she argued in that case. Thank you. Thank you, Your Honor. I'll give you one minute for rebuttal. I would like to take one more stab at explaining why the demonstration project statute does not render people eligible for Medicaid under the state plan. The statute in Section 1315A-2A does not say that a patient is made eligible, but it says that the costs of care which would not be covered by Medicaid, to the extent the Secretary prescribes, shall be regarded as expenditures under the state plan. So the statute does not make these people eligible for Medicaid under the state plan. It allows those costs to be thrown into the Medicaid cost reimbursement program. And then I'd like to just say two practical consequences if the court rules that this statute clearly covers demonstration projects. The first – yes. Excuse me. I don't think I quite understand what you just said. It allows the costs to be thrown into the Medicaid fund, but the people on whom it is spent are not eligible Medicaid beneficiaries. That's absolutely correct. It speaks in terms of how to treat the costs of caring for those people, and it allows matching payments by regarding the costs as being spent under Medicaid. It does not make those individuals eligible under the Title 19 plan. They qualify under a demonstration project which has different standards, which might have no close connection to the eligibility requirements that Congress enacted in the Medicaid Act. And the consequence of ruling that this statute clearly includes demonstration projects are twofold. The first is that demonstration projects will be strongly discouraged. It is very expensive to include them in the dish adjustment, $5 billion over the period of five years that the agency expanded its rule in 2000. Excuse me, $2 billion. This is very expensive. It's a hidden cost in authorizing an innovative demonstration project, and it will discourage them. The second is that we will have further distortions of the dish adjustment. We'll have situations where states are both serving low-income people, but one state, because they've changed the eligibility criteria, is getting far more dish money than the other state. Neither of these questions did Congress answer. Congress did not face these questions, and it would be very damaging to hold that they did. When there had never been a program at the time, Congress did not specifically refer to demonstration projects in the statute. Thank you, counsel. We understand your argument. Thank you. Thank you to both counsel. The case just argued is submitted for decision by the court, and this court is in recess. Thank you. All rise. This court for this session stands adjourned.
judges: T.G. Nelson, Rawlinson, Pollak